**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE:  (671) 477-2511
EMAIL:  pciville@guamattorneys.com

*Attorneys for Plaintiff*



**FILED**
DISTRICT COURT OF GUAM

FEB - 1 2012 mba

**JEANNE G. QUINATA**
**CLERK OF COURT**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA, for the
Use of INTERNATIONAL BRIDGE AND
CONSTRUCTION MARIANAS, INC.,

        Plaintiff,

        vs.

AMERICAN HOME ASSURANCE
COMPANY,

        and

TOA CORPORATION,
INTERNATIONAL BRIDGE
CORPORATION, and the IBC / TOA
JOINT VENTURE,

        Defendants.

CIVIL CASE NO. 12-00001

**COMPLAINT (MILLER ACT/
BREACH OF CONTRACT/
QUANTUM MERUIT )**

 

Plaintiff, the United States of America, for the Use of International Bridge and

Construction Marianas, Inc., alleges:

## PARTIES

1.    The Use Plaintiff, International Bridge and Construction Marianas, Inc.

("IBCM") is, and was at all times relevant hereto, a corporation organized under the

laws of the Commonwealth of the Northern Mariana Islands, and authorized to transact business on Guam.

2.      Defendant American Home Assurance Company ("American Home") is, and was at all times relevant hereto, a corporation organized under the laws of the State of New York and authorized to do business on Guam.

3.      Defendant International Bridge Corporation ("IBC") is, and was at all times relevant hereto, a corporation organized under the laws of the State of Ohio, and authorized to transact business on Guam.

4.      Defendant TOA Corporation ("TOA") is, and was at all times relevant hereto, a corporation organized under the laws of Japan.

5.      Defendant IBC / TOA Joint Venture ("JV") is, and was at all times relevant hereto, a joint venture organized on Guam between IBC and TOA for the purposes of submitting a bid for and performing as the prime contractor for United States Government contract number N62742-07-R-1314, AF FY08 MCON P-502 Kilo Wharf Extension at the Commander Naval Region Marianas, Main Base, Guam.

## JURISDICTION AND VENUE

6.      This action arises under 40 U.S.C. §§ 3131 and 3133, (formerly 40 U.S.C. §§ 270a and 270b), commonly known as the "Miller Act", in which this court has federal jurisdiction under 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over the Guam law claims for breach of contract and quantum meruit under 28 U.S.C. §1367(a).

8.      The contract at issue was to be performed and executed in Guam, and therefore venue in this district is proper under 40 U.S.C. § 3133(b)(3).  Venue in this

district is also appropriate under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims occurred in Guam.

## GENERAL ALLEGATIONS

9.     IBC / TOA Joint Venture, acting through IBC and TOA as joint venture partners, was at all times mentioned herein after March 6, 2008 the prime contractor for United States Government contract number N62742-07-R-1314, AF FY08 MCON P-502 Kilo Wharf Extension at the Commander Naval Region Marianas, Main Base, Guam ("the Contract" or "the Kilo Wharf Project"), a construction project to extend Kilo Wharf, Apra Harbor, Guam having a total contract price of $84,009,018.00.

10.     At all times relevant to this Complaint, TOA was the managing partner of the JV.

11.     After the JV submitted its bid, the U.S. Navy questioned IBC's financial ability to undertake a project as large as the Kilo Wharf Project.

12.     On January 31, 2007 Atsushi Ando, TOA's designated representative to the JV, in response to a December 10, 2007 letter to the JV from the U.S. Navy, advised Melvin S. Yoshimura, Contracting Officer for the U.S. Navy, that TOA had obtained a $90,000,000 credit line, and that TOA would be "jointly and severally liable on the contract." Although the $90 million credit line referenced in the January 31 letter was extended to TOA alone, it was TOA's intention that the credit line be a source of funding for all work on the Kilo Wharf Project by the JV partners.

13.     In representing to the U.S. Navy that TOA would be jointly and severally liable on the contract, TOA intended to and did commit itself to being responsible for the payment of all subcontractors providing labor, equipment or

3

materials on the Project without regard to which of the JV partners hired such subcontractor.

14.     On January 15, 2008 the JV submitted a Sub-Contracting Plan in which the JV represented that IBCM would be a subcontractor on the Project, and sought credit for the fact that IBCM was a veteran owned, Hub-Zoned, small business.

15.     On or about March 6, 2008 the JV signed the Contract with the U.S. Navy for the Kilo Wharf Project.

16.     On or about April 1, 2008, IBC, acting in its capacity as a partner of the JV and in furtherance of the business of the JV, entered into a written subcontract agreement with IBCM pursuant to which IBCM agreed to provide IBC equipment for use on the Kilo Wharf Project. A true and accurate copy of the subcontract is attached as **Exhibit A**.

17.     On April 3, 2008, pursuant to the terms of the contract, the JV, as principal, and American Home, as surety, executed and furnished the United States a payment bond in the amount of $84,009,018 ("Payment Bond"), in compliance with 40 U.S.C. § 3131, for the protection of all persons supplying labor and materials in the prosecution of the work provided for in the Contract.  A true and correct copy of the Payment Bond is attached hereto as **Exhibit B**.

18.     The Kilo Wharf Project was a large, complex project and the demands of the subcontract required that IBCM commit nearly all of its operational equipment to the Project for a period of more than two years.

19.     At the time IBCM entered into the written subcontract with IBC, IBCM was aware of TOA's representation to the U.S. Navy and IBC that TOA had obtained

4

a credit line for $90 Million and that TOA would be jointly and severally liable with IBC for performance under the Contract.

20.     TOA's representations regarding the $90 million line of credit it had obtained were made for the purpose of giving assurances that the JV had the financial resources and backing to prosecute the work on the Project and to pay Project costs, including costs incurred for labor, equipment and materials supplied to the Project.

21.     IBCM relied on these representations by TOA in making the decision to lease equipment to IBC for use on the Kilo Wharf Project, and to provide material and other support for the Project.

22.     In conjunction with the use of IBCM's equipment, IBC, acting on behalf of the JV and in furtherance of the business of the JV, also began purchasing base course, leveling course aggregate materials and other aggregate materials (collectively "quarry products") for use on the Kilo Wharf Project.

23.     The purchase of quarry products was made by IBC placing verbal orders for materials with IBCM.  IBCM thereupon processed the quarry products as needed to conform to the Navy's requirements under the Contract and delivered the processed, conforming quarry products to the Kilo Wharf Project site.  Upon delivery, IBC provided IBCM a receipt for the materials delivered, and the quarry products were thereafter incorporated into the Project.

24.     According to the terms of the Agreement for Rental of Equipment, IBC, agreed to pay IBCM a lump sum rental fee of $174,261.85 per month, for a period of 22 months beginning May 20, 2008.  Quarry products were supplied at IBCM's published list price.

5

25.     In accordance with the terms of the Agreement for Rental of Equipment, IBC supplied equipment, which was used on the Kilo Wharf Project from May 20, 2008 through February 19, 2011, and in accordance with the related agreements to provide quarry products as set forth above, IBCM supplied quarry products used on the Kilo Wharf Project from August 3, 2009 through November 11, 2010.

26.     The JV was formed for the purposes of submitting a bid for and performing as the prime contractor for the Kilo Wharf Project and IBCM was named as a subcontractor on the Project in the Sub-Contracting Plan submitted by the JV to the U.S. Navy.

27.     In contracting with IBCM for the equipment rental and purchase of quarry products for use in the Kilo Wharf Project, IBC, as a joint venture partner, was acting on behalf of and in furtherance of the business of the JV, and with the authority of the JV.

28.     In contracting with IBC, IBCM at all times believed that IBC was acting on behalf of and in furtherance of the business of the JV, and with the authority of the JV.

29.     IBCM has fully performed all of its duties under the Agreement for Rental of Equipment and related agreements for the purchase of quarry products.

30.     The total rental charges for equipment supplied for and used on the Kilo Wharf Project pursuant to the Agreement for Rental of Equipment was $5,145,249.00, of which IBCM has only been paid $2,962,437.00. The JV owes IBCM the unpaid balance of $2,182,812.00 under the Agreement for Rental of Equipment.

31.     The total charges for leveling course aggregate supplied to the Kilo Wharf Project by IBCM and used on the Project was $406,425.94, of which IBCM

6

has only been paid $298,698.52. The JV owes IBCM the unpaid balance $107,727.42 under the supply and purchase agreements for leveling course aggregate.

32. The total charges for other aggregate materials supplied to the Kilo Wharf Project by IBCM and used on the Project was $700,132.50, of which IBCM has been paid only $270,642.50. The JV owes IBCM the unpaid balance of $429,490.00 under the agreements to supply aggregate materials.

33. The total charge for equipment and quarry products supplied for and used on the Kilo Wharf Project was $6,251,807.44, of which the JV has only paid IBCM $3,531,778.02. There remains due and owing to IBCM under the Agreement for Rental of Equipment and the related supply and purchase agreements for quarry products the unpaid balance of $2,720,029.42.

34. All payments received by IBCM were made with funds provided to IBC by TOA, as the managing partner of the JV. All such funds had been supplied to TOA by the U.S. Navy in payment of periodic Progress Payment Applications submitted to the Navy by TOA. In submitting the Progress Payment Applications, TOA certified to the Navy that the subcontractors on the Project had already been paid for work covered by progress payments received up to the date of the Application, or that the subcontractors would be paid any amounts included in the current progress payment.

35. The amount claimed by IBCM is the reasonable value of the equipment and materials furnished by IBCM and used by the JV on the Kilo Wharf Project, less those amounts already paid to IBCM as set forth above.

7

36. IBCM has made demand for payment on IBC, on the IBC / TOA Joint Venture and on American Home, but there remains due and owing to IBCM the amount of $2,720,029.42.

37. TOA, as managing partner of the JV, has paid $2,923,461 to other subcontractors hired by IBC on the Project, but has refused to pay the amounts owed to IBCM.

38. On or before September 2011, counsel for the JV, at the direction of TOA, submitted, for a U.S. Government audit, a Request for Economic Adjustment ("REA") to the U.S. Navy. In the REA, the JV listed IBCM's costs for equipment and material as a subcontractor or vendor being due for work on the Project.

39. On a monthly basis, throughout the life of the Project, TOA's Project Manager and QC Manager submitted Payment Certifications to the U.S. Navy, in conjunction with the JV's requests for progress payments under the contract. In the Payment Certifications, TOA represented that all subcontractors on the project had been paid for work performed, or would be paid for work performed from the proceeds of the requested payments.

40. With the exception of one month in February 2009, when IBCM was fully paid, the representations by TOA in the Payment Certifications were false in that IBCM was a subcontractor on the Project and IBCM was not paid in full at the time the Payment Certifications were submitted and was not paid from the proceeds of the payment being requested.

41. IBCM has demanded payment from IBC of the amounts due under the subcontracts.

8

42.     IBC, as JV partner and acting for and on behalf of and in furtherance of the business of the JV, has responded to IBCM's demands by admitting that the amount IBCM claims is due to IBCM, and by stating that IBC does not have the funds available to pay the claim.

43.     IBCM has demanded payment from JV, but TOA, as managing partner of the JV, has not paid IBCM's claim.

44.     TOA's initial response to IBCM's demand was to claim that TOA's financial records on the Project were poorly maintained and that the JV needed until the beginning of December 2011 to ascertain whether IBCM's claim was valid.

45.     It is now well past the beginning of December and TOA has never denied that the JV owes the money claimed by IBCM.


## COUNT ONE
### (Miller Act Bond Claim Against American Home)

46.     IBCM restates and incorporates by reference the allegations contained in paragraphs 1-45 of this Complaint as though fully set forth herein.

47.     The Payment Bond issued by American Home is fully secured by a line of credit posted by TOA.

48.     IBCM was a subcontractor on the Project within the meaning of the Miller Act.

49.     IBCM provided equipment and materials to IBC, a partner in the JV, which were used on the Project.

50.     The date on which the last equipment or material was supplied to the JV for use by the JV on the Kilo Wharf Project was February 19, 2011.

9

51.     One year has not expired after the day on which the last of the equipment or materials were supplied by IBCM.

52.     IBCM has demanded payment from American Home for payment under the Payment Bond.

53.     American Home, acting on the advice of TOA, has denied payment on the purported grounds that IBCM is an insider to IBC and not entitled to protection under the Miller Act.

54.     IBCM has not been fully paid for the equipment and quarry products it provided for use on the Kilo Wharf Project.

55.     All conditions precedent for the bringing and maintenance of this action as required under the Payment Bond and the Miller Act have been performed or have occurred.

56.     Pursuant to the terms of the Miller Act, IBCM is entitled to a judgment against American Home, as surety on the Project, in the amount of $2,720,029.42, plus interest.

57.     Under the Agreement for Rental of Equipment, IBCM is entitled to its reasonable attorney's fees incurred in this action, including its claim under the Miller Act.

## COUNT TWO

### (Breach of Contract Against the IBC / TOA Corporation Joint Venture, IBC, and TOA Corporation)

58.     IBCM restates and incorporates by reference the allegations contained in paragraphs 1-57 of this Complaint as though fully set forth herein.

10

59.     IBCM had valid contracts whereby IBC rented IBCM's equipment and purchased from IBCM quarry products for use on the Kilo Wharf Project.

60.     In contracting with IBCM for the equipment rental and purchase of quarry products for use in the Kilo Wharf Project, IBC, as a joint venture partner, was acting on behalf of and in furtherance of the business of the JV, and with the authority of the JV.

61.     In contracting with IBC, IBCM at all times believed that IBC was acting on behalf of and in furtherance of the business of the JV, and with the authority of the JV.

62.     IBCM performed all its obligations under said contracts with the JV and has not been and is not in breach thereof.

63.     IBCM has demanded payment of the amounts due under the contracts from IBC, as JV partner and agent of the JV, and from TOA as managing partner of the JV.

64.     IBC, as JV partner and acting for an on behalf of and in furtherance of the business of the JV, has responded to IBCM's demands by admitting it owes the amount IBCM claims is due, and by stating that it does not have the funds available to pay the claim.

65.     An REA submitted for an audit to the U.S. Navy on or about September 2011, included the claim for the cost of equipment owned by IBCM as a vendor to the Joint Venture. The audit information was submitted to the U.S. government auditor by counsel for the JV at the direction of TOA.   Through its actions, TOA, as joint venture partner, admitted that payment is due to IBCM, and is estopped from denying that such payment is due to IBCM, but has refused payment of the amounts due and owing to IBCM.

11

66. The JV, and IBC and TOA as JV partners, breached the contracts with IBCM in that the JV and IBC and TOA as JV partners, failed and refused to pay IBCM the moneys due it under the contracts for equipment and quarry material furnished for use on the Kilo Wharf Project, as above set forth, and such breach was not excused.

67. IBCM has been damaged in the amount of $2,720,029.42 as a direct and proximate result of the neglect and refusal of the JV and IBC and TOA as its partners to pay the amounts due to IBCM under the Agreement for Rental of Equipment and the quarry product supply agreements.

68. The JV, and the individual joint venture partners IBC and TOA, are liable, jointly and severally, to IBCM for the unpaid balance of $2,720,029.42 due and owing to IBCM under the contracts as set forth more fully above.

69. Under the Agreement for Rental of Equipment, IBCM is entitled to its reasonable attorney's fees incurred in this action.

**COUNT THREE**

**(Quantum Meruit Claim Against the IBC / TOA Corporation Joint Venture, IBC, and TOA Corporation)**

70. IBCM restates and incorporates by reference the allegations contained in paragraphs 1-69 of this Complaint as though fully set forth herein.

71. IBCM supplied equipment and quarry products to the JV for use on the Kilo Wharf Project.

72. The equipment and quarry products supplied by IBCM for use on the Kilo Wharf Project were actually used by the JV in the Kilo Wharf Project.

12

73.     The JV benefitted from the equipment and quarry products supplied by IBCM for use on the Kilo Wharf Project.

74.     The JV has not fully compensated IBCM for the reasonable rental value for the equipment IBCM supplied to and used on the Project or the reasonable value of the quarry products supplied to and used on the Project.

75.     The JV, and the individual joint venture partners IBC and TOA, are liable, jointly and severally, to IBCM for the value of the equipment rented from IBCM to the JV and the value of the quarry products supplied by IBCM to the JV, and used on the Kilo Wharf Project, in the amount of $2,720,029.42.

## PRAYER FOR RELIEF

WHEREFORE, the following prayer for relief is made:

1.     On the First Cause of Action, The United States of America, for the Use of International Bridge and Construction Marianas, Inc., prays for judgment against American Home, for the sum of $2,720,029.42 as the balance due for the equipment and quarry materials supplied by IBCM, plus pre and post-judgment interest, attorney's fees, and costs of suit;

2.     Upon the Second Cause of Action, International Bridge and Construction Marianas, Inc., prays for judgment against the IBC / TOA Joint Venture, and the individual joint venture partners IBC and TOA, jointly and severally, for the sum of $2,720,029.42, as the balance due for the equipment rental and quarry products provided by IBCM, plus pre and post-judgment interest, attorney's fees, and costs of suit;

3.     Upon the Third Cause of Action, International Bridge and Construction Marianas, Inc., prays for judgment against the IBC / TOA Joint Venture, and the

13

individual joint venture partners IBC and TOA, jointly and severally, for the sum of $2,720,029.42, for the reasonable rental value for the equipment supplied by IBCM and used on the Project and the reasonable value of the quarry products supplied by IBCM and used on the Project, for which IBCM has not been paid, plus pre and post-judgment interest, and costs of suit;

4.    For such other and further relief as to the Court may deem just and proper.

DATED this 1st day of February, 2012.

CIVILLE & TANG, PLLC

By_____

**G. PATRICK CIVILLE**
*Attorneys for Plaintiff*

14

# EXHIBIT A

## AGREEMENT FOR RENTAL OF EQUIPMENT

THIS AGREEMENT FOR RENTAL OF EQUIPMENT ("this Agreement") is entered into as of April 1, 2008 by and between International Bridge & Construction Marianas, a Northern Marianas Corporation ("IBC/M") and International Bridge Corporation, an Ohio corporation ("IBC").

WHEREAS:

A. IBC/M and IBC have undertaken to enter into this rental agreement. In order for IBC to carry out its work on the Kilo Wharf Extension project, the parties have agreed that it is necessary and convenient for IBC to rent from IBC/M the construction machinery and equipment ("Equipment") listed in Exhibit A to this Agreement.

NOW, THEREFORE, in consideration of the premises and upon the terms and conditions contained herein, the parties hereby agree as follows:

1. RENTAL OF EQUIPMENT.

   (a) IBC/M hereby rents the Equipment to IBC and delivers the Equipment under rental to IBC for the term of rental specified in Exhibit "A", and IBC hereby rents from IBC/M and accepts delivery of the equipment from IBC/M on May 20, 2008.

   (b) The term of rental of Equipment shown on Exhibit A shall be for twenty-two (22) calendar months or such shorter term as the Equipment is required for the execution of the Kilo Wharf Project.

2. CONSIDERATION FOR RENTAL.

   (a) The rental fee for the Equipment is the lump sum of One Hundred Seventy Four Thousand Two Hundred Sixty One and 85/100 Dollars ($174,261.85) per month (the "Rental Fee").

   (b) IBC shall pay the Rental Fee by making payments to IBC/M in a monthly payment of One Hundred Seventy Four Thousand Two Hundred Sixty One and 85/100 Dollars ($174,261.85) for a period of twenty-two (22) months.

   (c) Except for items listed on Exhibit "A" as dredging equipment. The hours of use of the equipment will be based on 176 hours per month.

3. DELIVERY AND RETURN

   (a) The Equipment shall be deemed delivered to IBC on May 20, 2008.

   (b) Without limitation, IBC undertakes to return the Equipment to IBC/M at the end of the relevant term of rental at a location designated by IBC/M in the Territory of Guam or at such other location or locations as the parties may agree in writing.

4. IBC'S DUTIES REGARDING THE EQUIPMENT

   (a) IBC shall at all times keep, use and maintain the Equipment with the care of a good manager. IBC shall follow proper use and maintenance instructions and procedures.

(b)   IBC shall bear all risk of loss or damage to the Equipment of whatever cause or nature (normal wear and tear excluded) from point of delivery to point of return as provided in Clause 3 above.

(c)   IBC shall provide, maintain, and pay for insurance against the loss or theft of or damage to the equipment, for the estimated replacement value of $6,500,000.00. Liability is covered by the project insurance.

(d)   Except as the parties shall expressly agree in writing IBC shall:

(i)   use the Equipment listed on Exhibit "A" only for the Kilo Wharf Project.

(ii)   keep the Equipment at the Project sites or at work or storage areas in the vicinity of the Project sites or at locations provided by IBC/M for such purpose (which areas will be provided free of charge).

(e)   IBC shall be responsible for the costs of fuel, lube oil, grease, major and field parts and material, repair and maintenance. Such services and supplies will be supplied by IBC.

## 5. OTHER AND FURTHER DOCUMENTS; COOPERATION OF IBC.

(a)   IBC/M if requested by IBC, agrees to provide the support, maintenance and repair of the Equipment subject to Paragraph 4(e). All repair, labor, major and field parts and material (including freight), and lube oils, grease and fuel will be paid by IBC. The payment for these goods and services will be made monthly based on costs presented by IBC/M.

## 6 REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS OF IBC.

(a)   IBC/M represents and warrants that it is the Owner of all the Equipment.

(b)   During the term of rental, IBC/M shall not allow the sale or lease or disposal of any of the Equipment.

## 7. GOVERNING LAW.
This Agreement shall be construed in accordance with and governed by the laws of the Territory of Guam applicable to agreements made and to be performed wholly within such jurisdiction.

## 8. ENTIRE AGREEMENT.
This Agreement constitutes the entire agreement between the parties regarding the rental of the Equipment and supersedes all prior discussions or agreements related to the same.

## 9. NOTICES.
All notices to be given hereunder shall be in writing and personally delivered (including delivery by courier or similar service) or sent by registered or certified mail, return receipt requested, postage prepaid, to the addresses set forth below or to such other address as so notified in writing by the parties. If either party hereto has changed its address, a written notice thereof shall be given to the other party hereto. All notices shall be deemed to have been given on the date actually received, or if sent by mail, on the fifth (5th) day following deposit in the mail.

Case 1:12-cv-00001   Document 1   Filed 02/01/12   Page 17 of 25

|            |                                                                                      |
|------------|--------------------------------------------------------------------------------------|
| If to IBC: | International Bridge Corporation<br>P. O. Box 21149<br>Barrigada, Guam 96921 |
| If to IBC/M: | International Bridge & Construction Marianas, Inc.<br>P. O. Box 21149<br>Barrigada, Guam 96921 |

## 10. DISPUTE RESOLUTION.

a. The parties hereto expressly and irrevocably agree that any and all claims, disputes, differences and other matters in question between them arising out of or relating to this Agreement or the Equipment, or relating to the performance of this Agreement, or any rights, property, transactions, obligations or issues pursuant to, arising out of or affected by the provisions hereof, or from the claimed breach hereof ("Subject Dispute"), shall (subject to Paragraph 10(c) hereof) be exclusively and finally resolved by arbitration pursuant to the Construction Industry Rules of the American Arbitration Association then in effect or to such other procedure as shall be mutually agreed upon between the parties. Such arbitration shall be conducted by one (1) arbitrator selected in accordance with such rules.

b. The place of arbitration shall be in Hagatna, Guam. This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law, and any award rendered by the arbitrators shall be final. Judgment may be entered upon any award rendered by the arbitrators in accordance with applicable law in any court having jurisdiction over the claim, dispute or other matter in question.

c. The provisions of Paragraphs 10(a) and (b) notwithstanding, each party shall have the right to seek interim relief in the courts of competent jurisdiction to enforce this Agreement and any of its provisions by temporary restraining order, preliminary injunction, specific performance or other interim relief, without bond and without prejudice to any other rights and remedies which such party have for a breach of this Agreement. The initiation of an action for temporary restraining orders, preliminary injunctions and/or other interim relief by either party pending final resolution of a Subject Dispute or Subject Disputes pursuant to this Clause 10 shall not constitute a waiver by such party of its rights to require that Subject Disputes be resolved in accordance with Paragraphs 10(a) and (b) hereof.

d. The prevailing party in any arbitration proceeding, and in any court proceedings between the parties, including without limitation court proceedings brought for the purpose of obtaining interim relief and/or for the purpose of enforcing this agreement to arbitrate or to enforce any award made pursuant to arbitration hereunder, shall be entitled to recover the costs of the proceedings and its reasonable legal fees and expenses incurred in connection with all such proceedings. The arbitrator or court seized of any such proceeding shall determine which is the prevailing party and what is the reasonable amount of legal fees and other expenses for purposes hereof.

e. Without limitation or prejudice to the provisions of Paragraphs 10(a), (b), (c) or (d) hereof, each of the parties hereto irrevocably waives any right to require a jury in any civil law suit arising between the parties hereto.

### Addendum to Agreement for Rental of Equipment

This document serves as an addendum to the rental agreement between International Bridge Corporation (IBC) and International Bridge & Construction Marianas, Inc. (IBCM) for leasing of equipment listed and attached as Exhibit A of the agreement.

This addendum will amend Number 6 Representations, Warranties and Undertakings of IBC Section (b) of agreement. IBC will allow IBCM to sublet any equipment that is not being currently used and or while on standby for use.


International Bridge & Construction
Marianas, Inc.


By:
Name: William E. Toelkes
Title: President


International Bridge
Corporation


By:
Name: Robert W. Toelkes
Title: President

# IBC/M KILO WHARF PROJECT EQUIPMENT RENTAL RATES

March 26, 2008 - April 10, 2008

Monthly Rate: $ 174,261.85

Kilo Wharf - Dedicated Equipment

** IBCM Monthly Rates Do Not Include Fuel or Maintenance

| Eqpt no. | Description | Equip Serial No. | Unit | Monthly Rate Per Unit Based on 176 Hours Per Month | No. of Units | TOTAL Monthly Rate | Total No. of Months | Total Accum. |
|---|---|---|---|---|---|---|---|---|
| 1538/1536 | Atlas; 185 CFM - Ai | 313501UBK219 / 304501UBK219 | EA | 1,331.97 | 4 | 5,327.87 | 10.00 | 53,278.7 |
| 737 | Nordberg Crusher | | EA | 30,800.00 | 1 | 30,800.00 | 6.00 | 184,800.0 |
| 1846 | IR; SD-115; XX TN - | 152379 | EA | 3,600.00 | 1 | 3,600.00 | 15.00 | 54,000.0 |
| 1832 | IR; P1-125; XX TN - | 160270 | EA | 3,600.00 | 1 | 3,600.00 | 15.00 | 54,000.0 |
| 1641 | CAT; CB-534C; XX TN | 5HR00710/120083 | EA | 4,576.00 | 1 | 4,576.00 | 2.00 | 9,152.0 |
| 1836 | CAT; CB-634C; XX TN | 3FR00317 | EA | 4,928.00 | 1 | 4,928.00 | 2.00 | 9,856.0 |
| 804 | CAT; AP1050; 16 ft | 1JG00147 | EA | 8,729.00 | 1 | 8,729.00 | 2.00 | 17,458.0 |
| 1176-1180 | Rugby; 10 TN Cement | M6SAU151/2/3/4/5 | EA | 1,830.00 | 2 | 3,660.00 | 18.00 | 65,880.0 |
| 2737 | TEREX; 400 CY/HR Co | 601A3C | EA | 12,226.00 | 1 | 12,226.00 | 18.00 | 220,068.0 |
| 10008-10009 | Peterbuilt; 12 CY T | 117782P | CY | 2,122.00 | 3 | 6,366.00 | 18.00 | 114,588.0 |
| 3126 | Manitowoc; 3900; 14 | 39000G | EA | 10,208.00 | 1 | 10,208.00 | 20.00 | 204,160.0 |
| 3109 | Manitowoc; 4600; 24 | 46-349 | EA | 36,896.00 | 1 | 36,896.00 | 8.00 | 295,168.0 |
| 3113 | Manitowoc; 4600; 24 | 46-384 | EA | 21,600.00 | 1 | 21,600.00 | 8.00 | 172,800.0 |
| | American; 550; 50 T | | EA | 5,280.00 | 1 | 5,280.00 | 20.00 | 105,600.0 |
| 3131 | P&H; 780TC; 80 TN | 55897 | EA | 7,744.00 | 1 | 7,744.00 | 10.00 | 77,440.0 |
| 3105 | Grove; 875; 80 TN - | 47562 | EA | 15,840.00 | 1 | 15,840.00 | 12.00 | 190,080.0 |
| 3205 | 7 CY Dragline Bucket Atta | 42171 | EA | 1,056.00 | 1 | 1,056.00 | 8.00 | 8,448.00 |
| 3255 | 5 CY Clam Bucket Attachme | CS-927 | EA | 1,056.00 | 1 | 1,056.00 | 8.00 | 8,448.00 |
| 3292 | 4 CY Clam Bucket Attachm | | EA | 845.00 | 1 | 845.00 | 8.00 | 6,760.00 |
| 3249 | 2 CY Clam Bucket Attachm | | EA | 493.00 | 1 | 493.00 | 8.00 | 3,944.00 |
| | Rock Breaker Chisel Attac | | EA | 1,816.00 | 1 | 1,816.00 | 12.00 | 21,792.00 |
| | Pile Driver Attachment | | EA | 12,320.00 | 1 | 12,320.00 | 0.00 | |
| 715 to 717 | 60 ft Radial Stackers | RITCH-BROS 6-03 | EA | 1,126.00 | 2 | 2,252.00 | 5.00 | 11,260.00 |
| 718 | Protough 2 Deck Screen | 74000838 | EA | 2,628.00 | 1 | 2,628.00 | 5.00 | 13,140.00 |
| 115 | Komatsu; 155; D8 Si | 50950 | EA | 6,688.00 | 1 | 6,688.00 | 12.00 | 80,256.00 |
| 231 | CAT; 245; 4 CY - Ex | 6MI0061 | EA | 6,856.00 | 1 | 6,856.00 | 15.00 | 102,840.00 |
| 229 | CAT; 375L; 4 CY - E | 8XG0201 | EA | 8,024.00 | 1 | 8,024.00 | 16.00 | 128,384.00 |
| 221 | 10000 FT-LB Rockram Hydra | 51G00396 | EA | 4,787.00 | 2 | 9,574.00 | 5.00 | 47,870.00 |
| 1904 | CAT; HX7P1; 75 KW - | E406SAV002 | EA | 3,168.00 | 1 | 3,168.00 | 5.00 | 15,840.00 |
| 1936 | CAT; XXX; 250 KW - | 63050 60CY | EA | 4,576.00 | 1 | 4,576.00 | 5.00 | 22,880.00 |
| 1940 | CAT, 250KW (Rebuilt) | | EA | 3,225.00 | 1 | 3,225.00 | 18.00 | 58,050.00 |
| 1906 | CAT D3S30-200KW | 210RH647 | EA | 3,168.00 | 1 | 3,168.00 | 8.00 | 25,344.00 |
| 1903 | CAT; SR4; 545 KW - | 61A09337 | EA | 5,096.00 | 1 | 5,096.00 | 18.00 | 91,728.00 |
| 7007 | Skagit B 20 TN Hoist | B20310RH | EA | 1,173.00 | 1 | 1,173.00 | 2.00 | 2,346.00 |
| 327 | Komatsu ; 350, 3 CY | 20352 | EA | 4,576.00 | 1 | 4,576.00 | 4.00 | 18,304.00 |
| 318 | CAT; 246; 1/2 CY - | 5SV01589 | EA | 2,816.00 | 1 | 5,632.00 | 8.00 | 45,056.00 |

# IBC/M KILO WHARF PROJECT EQUIPMENT RENTAL RATES

March 26, 2008  April 10, 2008

Monthly Rate: $ 174,261.85

Kilo Wharf - Dedicated Equipment

## ** IBCM Monthly Rates Do Not Include Fuel or Maintenance

| Tag NO. | Description | Equip Serial No. | Unit | Monthly Rate Per Unit Based on 176 Hours Per Month | No. of Units | TOTAL Monthly Rate | Total No. of Months | Total Accum. |
|---|---|---|---|---|---|---|---|---|
| 373 | CAT; 950; 3 CY - Wh | 5SS01608 | EA | 4,928.00 | 2 | 9,856.00 | 20.00 | 197,120.00 |
| 373 | CAT; 980; 5CY - Whe | 2KR00678 | EA | 8,800.00 | 1 | 8,800.00 | 18.00 | 158,400.00 |
| 315 | CAT; 988B; 6 CY - W | 50W04744 | EA | 9,504.00 | 1 | 9,504.00 | 4.00 | 38,016.00 |
| 2379 | Cat; TH-83; XX-Tele | 3RR07721 | EA | 3,168.00 | 1 | 3,168.00 | 5.00 | 15,840.00 |
| 2308 | JCB; 930; XXX-Tele | 661046 | EA | 1,267.00 | 1 | 1,267.00 | 18.00 | 22,806.00 |
| 502 | CAT; 140H; 14 ft - | 2250J624 | EA | 6,336.00 | 2 | 12,672.00 | 6.00 | 76,032.00 |
| 1036-1027 | 5 TN; 10-Wheel Dump Truck | TYP# 1M2P198C9W002449 | EA | 4,576.00 | 4 | 18,304.00 | 16.00 | 292,864.00 |
| 1170-1175 | 25 TN Bellydump Semitruck | TYP# 5856 | EA | 2,520.00 | 4 | 10,080.00 | 7.00 | 70,560.00 |
| 1150-1157 | 25 TN Semi-End Dump Truck | 20690/7024E | EA | 2,520.00 | 4 | 10,080.00 | 16.00 | 161,280.00 |
| 1013-1015,1108 | 40 TN; Flatbed Semi-Truck | TYP#U80DV80598 | EA | 2,112.00 | 2 | 4,224.00 | 3.00 | 12,672.00 |
| 1100 | Low Boy Equipment Transpo | 3852 | EA | 4,576.00 | 2 | 9,152.00 | 6.00 | 54,912.00 |
| 17070 | 1/2 TN Pickup | TYP# 1FTRF12228KD43709 | EA | 890.00 | 12 | 10,680.00 | 18.00 | 192,240.00 |

3,833,760.72

/ 22 months

174,261.85

# Dredging Equipment

## SCHEDULE OF EXHIBITS

Exhibits A attached hereto are an integral part of this Agreement.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be signed by their duly authorized representatives as of the date set forth herein.

**INTERNATIONAL BRIDGE &
CONSTRUCTION MARIANAS, INC.**

**INTERNATIONAL BRIDGE
CORPORATION**

By:
Name: William E. Toelkes
Title: President

By:
Name: Robert W. Toelkes
Title: President

# EXHIBIT B

| PAYMENT BOND<br>*(See instructions on reverse)* | DATE BOND EXECUTED *(Must be same or later than date of contract)*<br>April 3, 2008 | OMB No.:B08 02 |
|---|---|---|

Public reporting burden for this collection of information is estimate to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405

| PRINCIPAL *(Legal name and business address)*<br>IBC / TOA Corporation<br>P.O. Box 21149,<br>GMF, Guam 96921 | TYPE OF ORGANIZATION *("X" one)* |
|---|---|

TYPE OF ORGANIZATION ("X" one)
- [ ] INDIVIDUAL
- [ ] PARTNERSHIP
- [X] JOINT VENTURE
- [ ] CORPORATION

STATE OF INCORPORATION
Guam

| SURETY(IES) *(Name(s) and business address(es)*<br>AMERICAN HOME ASSURANCE COMPANY<br>70 PINE STREET,<br>New York, NY 10270 | | | | |
|---|---|---|---|---|
| | **PENAL SUM OF BOND** | | | |
| | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
| | 84 | 009 | 018 | .00 |
| | CONTRACT DATE<br>March 26, 2008 | CONTRACT NO.<br>N62742-08-C-1301 | | |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

WITNESS:

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| | PRINCIPAL | | |
|---|---|---|---|
| SIGNATURE(S) | 1. *(Seal)* | 2. *(Seal)* | *(Seal)* |
| NAME(S) &<br>TITLE(S)<br>*(Typed)* | 1. Robert W. Toelkes<br>Vice President (IBC) | 2. Atsushi Ando<br>Manager (TOA) | |

| | INDIVIDUAL SURETY(IES) | |
|---|---|---|
| SIGNATURE(S) | 1. | 2. |
| NAME(S)<br>*(Typed)* | 1. *(Seal)* | 2. *(Seal)* |

| | CORPORATE SURETY(IES) | | |
|---|---|---|---|
| SURETY A | NAME &<br>ADDRESS | AMERICAN HOME ASSURANCE COMPANY<br>70 Pine Street, New York | STATE OF INC.<br>NY | LIABILITY LIMIT<br>$ 84,009,018.00 |
| | SIGNATURE(S) | 1. | 2. | |
| | NAME(S) &<br>TITLE(S)<br>*(Typed)* | 1. Raymond A. Martinez<br>Attorney- In- Fact | 2. Hagatna, Guam | |

AUTHORIZED FOR LOCAL REPRODUCTION<br>Previous edition is usable

STANDARD FORM 25A (REV. 10-98)<br>Prescribed by GSA-FAR (48 CFR 53.228(c))

| | CORPORATE SURETY(IES) (Continued) | | | |
|---|---|---|---|---|
| **SURETY B** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |
| **SURETY C** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |
| **SURETY D** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |
| **SURETY E** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |
| **SURETY F** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |
| **SURETY G** | NAME & ADDRESS | | STATE OF INC. | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. | | 2. | |
| | NAME(S) & TITLE(S) (Typed) | 1. | | 2. | |

## INSTRUCTIONS

1. This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270e). Any deviation from this form will require the written approval of the Administrator of General Services.

2. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

3. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space

designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties.

(b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28) for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning their financial capability.

4. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

5. Type the name and title of each person signing this bond in the space provided.